ROBERTSON v. BLAINE COUNTY, IDAHO.

(Circuit Court, D. Idaho. February 1, 1898.)

1. LIMITATION OF ACTIONS—COUNTY BONDS—ORGANIZATION OF NEW COUNTY.

A law organizing a new county from territory composing other counties, and providing that the new county shall assume the indebtedness of the old counties, and that all existing rights of action by or against either of them may be maintained by or against the new county, does not create a new debt, or renew, or by implication extend, the time of payment of any obligation of either of such counties, so as to affect the running of limitation against it.

2. SAME—PLEA OF BAR BY MUNICIPALITY.

A county may plead the bar of the statute of limitations to an action on its bonds, although it has never levied any tax for their payment, as provided by the law authorizing their issue.

This was an action by Frank C. Robertson against Blaine county, Idaho, to recover on certain county bonds issued by Alturas county, a part of whose territory is at present included in the county of Blaine. The case was heard on demurrer to the complaint, setting up the statute of limitations.

Selden B. Kingsbury, for plaintiff.
Lyttleton Price, for defendant.

BEATTY, District Judge. To the complaint herein the defendant demurred, pleading the statute of limitations. From the complaint it appears that by an act of the territorial legislature approved February

8, 1883, the issue by Alturas county of the bonds herein sued upon was authorized for the purpose of building in said county a court house and jail, the principal of such bonds "to become due and payable November 1, 1891"; that "the board of county commissioners of said county shall, at the time of levy of county taxes, include therein a levy of sufficient tax to meet the interest and principal of said bonds as the same shall become due, and the tax so levied shall be known as the 'Court House Bond Tax,' and shall be collected as other taxes are collected, and shall constitute a separate fund, and shall be used for no other purpose, and for the payment of said bonds, principal and interest, all the taxable property of said county is hereby pledged"; that by an act in 1889 Alturas county was divided into Alturas, Logan, and Elmore counties, and by an act approved March 5, 1895, Blaine county was organized out of the territory composing Alturas and Logan counties, and it was provided by section 7 that "all valid and legal indebtedness of Alturas and Logan counties shall be assumed and paid by the county of Blaine," and by section 8 that "all rights of action now existing in favor of or against said Alturas or Logan counties may be maintained in favor of or against Blaine county"; that on the 18th day of March, 1895, the legislature passed another act cutting off from Blaine county the county of Lincoln. By this last act it appears that Blaine county was left composed chiefly of the territory which had, just prior to the passage of the two last acts named, constituted Alturas county. By section 4052, Rev. St. Idaho, it is provided that "an action upon any contract, obligation or liability not founded upon an instrument in writing," must be commenced within five years from the time it becomes due. This action was commenced September 30, 1897.

1. The plaintiff claims that the statute of limitations does not apply —First, because by the act creating Blaine county the debt was, at that date, renewed and legislated upon Blaine; and, second, because neither Alturas nor Blaine county has ever levied any tax or in any manner raised any funds applicable to the payment of the debt. While counsel, in support of his proposition that this debt is to be treated as contracted on March 5, 1895, cites, among other authorities, Ang. Lim. and Ballard v. Bell, 4 Fed. Cas., from which the argument would seem to follow that such a debt as this is a "specialty" and a creature of statute, and that to such the statute of limitations does not apply, it must be observed that those authorities refer to the statute of limitations of King James, which applied to "actions of debt grounded on any lending or contract without specialty." Certainly, under that statute, specialties, which were only a higher grade of contracts because sealed, were excepted from its operation; so, also, debts created by statute were not included thereunder. But the Idaho statute sweeps away all those intricate distinctions, as well as the much learning displayed in their discussion, and, whether the debt here sued upon is a specialty or a creature of statute, it is within the intent of the Idaho law, for it includes all kinds of contracts, whether under seal or not, and all debts created by statute.

Under this branch of the case, certainly, the important question is when the debt sued upon became due; if not until March 5, 1895, as

claimed by plaintiff, then unquestionably it is not barred. But, first, what is the debt sued upon? Plaintiff's counsel says it is in the nature of a specialty; that it was created by statute on the 5th day of March, 1895; and that such act operated to create of the bonds a new debt against Blaine county from that date. The complaint is not framed as upon a new debt, but it alleges all the facts leading up to the issue of the bonds; then copies one to answer for all, which, upon its face, shows it became due November 1, 1891; and demands judgment for "the principal sum of said bonds," for the coupons attached to them, and interest. Surely, this complaint, upon its face, indicates an action upon the original bonds, and not upon a debt growing out of them, created at a subsequent date.

It cannot be doubted that the legislature might, at least before the bar of the statute had attached, have extended the time for their payment, or have fixed another date than that first fixed when they should become due. The legislature has not, at least in explicit terms, done so. Has it done so by implication? All that it seems to have done is by sections 7 and 8, above quoted, which simply direct that all existing indebtedness of Alturas and Logan counties should continue as valid, and be assumed and paid by Blaine, and that the same actions that might have been maintained by or against Alturas can be by or against Blaine. It did not in terms create a new debt, but recognized the validity of the old, and that Blaine should pay it, and, as there was no pretense of changing the time or manner of payment, it seems clearly to follow that it must be paid by Blaine just as Alturas was to pay it. Blaine county simply took the place occupied by Alturas; it assumed all its burdens, and was invested with all its rights. Had Alturas continued to exist, and continued responsible for this debt, would it not be one of its rights to plead the bar of the statute against this claim after five years from November 1, 1891? To me it seems so unquestionably, if a county may ever plead the statute. If this was a right due Alturas, why should it not inure to Blaine, upon which is entailed all the burdens? Moreover, while in name Blaine county is a new party, in this transaction in reality it is substantially the same people and territory which composed Alturas county. It is in substance the same party by another name, continuing responsible for the same debt. The complaint, as well as counsel's brief, refers to the new promise of both Alturas and Blaine counties to pay the debt, but under the Idaho statute (section 4078) no such promise or acknowledgment is sufficient to bar the operation of the statute, "unless the same is contained in some writing signed by the party to be charged therewith." It appears to me that only through a strained construction can it now be held that this action is upon a new promise, or that as to defendant it is to be deemed one created or accruing from March 5, 1895.

2. Under the claim that defendant cannot avail itself of the statute, because neither county had levied a tax or raised funds to pay this debt, it is argued that the duty of paying it is such an express trust upon the county as bars the operation of the statute; and in general support of this proposition, among other citations, are Underhill v. City of Sonora, 17 Cal. 173; Freehill v. Porter (Cal.) 4 Pac. 646; and

County of Lincoln v. Luning, 133 U. S. 529, 10 Sup. Ct. 363.   If the views advanced by counsel are correct,—and they are sustained by these authorities, provided the facts upon which the latter rest are such as to make them applicable to this case,—it certainly would seem that a municipal debtor can seldom, if ever, plead limitations.   If such a debtor is always a trustee of an express trust; if it must always show it has levied the necessary taxes or actually collected the money to pay the debt before it can so plead,—and it seems the argument is nothing less than this,—there is little, if any, opportunity for it ever to plead the statute.   Certainly it is the duty of a municipal debtor to pay its debts, and in a sense a trust devolves upon it to do so, but it is likewise as much the duty of an individual debtor to pay his debts, and a like trust devolves upon him to pay.   That the municipal debtor acts through its agents and representatives can make its duty to pay and its trusteeship no different from that of the individual debtor.   Even if courts should attempt to make a distinction between the class of debtors in this regard, the Idaho statute under consideration does not, but, so far as its phraseology goes, it is applied to all alike.   It cannot be that these decisions referred to by counsel attempt to strike out all application of the statute to municipal debtors, or that they should be considered as counsel would have them; in fact, in each there is an implication that the statute may be applied to such debtors when the facts justify.   Let us examine them briefly.   In the Sonora Case it appears that before the bonds were due the legislature extended the time of, and provided a special fund for, their payment, and this legislative act was subsequently repeated.   The court says the recognition of the debt, and the making of provision for its payment by the legislature, "is enough to withdraw the case from the operation of the statute"; but, in addition to this, conceding the power of the legislature to so extend the time of payment, it was in this case so extended from time to time that the debt never became barred.   These facts are far different from those in this case.   Here the legislature recognized the debt, but did not extend the time of payment, nor did it provide any special tax, fund, or means of payment, but the whole question of the time and means was left as in the original bill.   In the case of Freehill v. Porter the facts are too briefly stated for its full understanding.   It does appear, however, that 55 per cent. of certain revenue provided for was set apart for the payment of the bonds and their interest, and that this fund so expressly devoted to this special purpose had been diverted by some of the officers of the corporation.   The opinion says that, "according to the act of 1863 (not recited), no action could be maintained against the city on these bonds or coupons"; and also it says, as claimed by counsel in this case, that "it was the duty of the city to make provision for the payment of the bonds and coupons according to the statute under which they were issued, and, by omitting to perform such duty, the city could not create the defense of the statute of limitations; not until the funds were in the treasury, properly available, would the statute begin to run; not until that period would the petitioner have any right of action or proceeding against the treasurer."   Why not? Presumably from some provision of the statute specially applicable to the matter.   It will be noted also that this was an action of mandamus

against the treasurer, probably to pay out the funds collected under the law for this very purpose. While the facts are not fully reported, there is sufficient in the case to show it is not like the one under consideration, and that it is not a guide for it.

In 133 U. S. and 10 Sup. Ct. it is said that:

"By the general limitation law of the state some of the coupons were barred, but there has been this special legislation in reference to these coupons: The bonds were issued under the funding act of 1873. In 1877 the county was delinquent in its interest, and the legislature passed an act amendatory to the act of 1873. This amendatory act provided for the registration of overdue coupons, and imposed upon the treasurer the duty of thereafter paying the coupons, as money came into his possession applicable thereto, in the order of their registration. St. Nev. 1877, p. 46. The coupons, which by the general limitation law would have been barred, were presented as they fell due to the treasurer for payment, and payment demanded and refused, because the interest fund was exhausted. Thereupon the treasurer registered them as presented, in accordance with the act of 1877, and from the time of their registration to the commencement of this suit there was no money in the treasury applicable to their payment. This act providing for registration and for payment in a particular order, was a new provision for the payment of these bonds, which was accepted by the creditor, and created a new right upon which he might rely. It provided, as it were, a special trust fund, to which the coupon holder might, in the order of registration, look for payment, and for payment through which he might safely wait. It amounted to a promise on the part of the county to pay such coupons as were registered in the order of their registration, as fast as money came into the interest fund, and such promise was by the creditor accepted; and when payment is provided for out of a particular fund, to be created by the act of the debtor, he cannot plead the statute of limitations until he shows that the fund has been provided."

The opening sentence of the above quotation says that certain coupons were already barred, but for those in question there had been such special legislation as protected them against the statute. This special legislation was, in part, that the treasurer should thereafter pay the "coupons, as money came into his possession applicable thereto, in the order of their registration"; that is, the coupons were not payable, not due, until the money was actually in the treasury to pay them. Certainly, under such a provision, the statute of limitations could not begin to run until such event occurred, and this is all that is decided. It further appears that from the registration of these coupons to the commencement of the suit there was no money in the treasury; hence the coupons could not have been barred. Thus, in all these cases where the statute was held not to obtain, it distinctly appears there had been such legislation as extended the time of payment, or as set apart a special fund for payment, and so dedicated to this special purpose as well might constitute an express trust.

As appears, the law applicable to this case is quite different. There certainly is nothing in it which prevented the holder of the bonds after November 1, 1891, from maintaining his action thereon. There never was any fund dedicated specially to the payment of these bonds, nor any special provision for their payment, except the general one in the original act before referred to. If that is sufficient to constitute such a special fund, or such an express trust as to avoid the operation of the statute, then, as before said, the statute is virtually a dead letter as to all municipal debtors; for every law authorizing the issue of bonds

makes some such general provision for their payment, and yet it has been often held that actions upon them become barred by neglect. If this were simply a question of ethics, the demurrer would be overruled, but, being one of law alone, it is sustained. While, for personal reasons, I would have avoided considering this case, yet there being no legal objections, nor any suggestions to the contrary made, I have heard it, but expect it will be taken to another court for review.